IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
October 21, 2014 Session

## DAVID DEWAYNE SMITH v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Cumberland County**
**No. 8358-B      Leon C. Burns, Jr., Judge**

_____

**No. E2013-02833-CCA-R3-PC - Filed January 13, 2015**

_____

The Petitioner, David Dewayne Smith, was indicted along with three other individuals for first degree murder and conspiracy to commit first degree murder. Before trial, the State entered a nolle prosqeui as to the charges against one co-defendant and entered into a plea agreement with another. The trial proceeded against the Petitioner and the remaining co-defendant. On the third day of trial, the State announced that it had entered into a plea agreement with the remaining co-defendant, and the co-defendant would testify against the Petitioner. Trial counsel made oral motions for a mistrial and a continuance, both of which were denied by the trial court. The Petitioner was convicted of first degree murder and conspiracy to commit first degree murder, and this Court affirmed his conviction on appeal. The Petitioner subsequently filed a petition for post-conviction relief alleging ineffective assistance of counsel. After a hearing, the petition was denied. On appeal, the Petitioner challenges the denial of post-conviction relief on 12 grounds. After a thorough review of the record and the applicable law, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the Court, in which JAMES CURWOOD WITT, JR., and D. KELLY THOMAS, JR., JJ., joined.

Harvey Douglas Thomas, Algood, Tennessee, for the appellant, David Dewayne Smith.

Robert E. Cooper, Attorney General and Reporter; Renee W. Turner, Senior Counsel; and Joseph D. Baugh, Special Prosecutor, for the appellee, State of Tennessee.

**OPINION**

Following a jury trial, the Petitioner, David Dewayne Smith, was convicted of first degree premeditated murder and conspiracy to commit first degree murder. He received concurrent sentences of life for the first degree murder conviction and 20 years for the conspiracy conviction. This Court affirmed his convictions on appeal, and the Tennessee Supreme Court declined review. State v. David Dwayne Smith, No. E2007-00084-CCA-R3-CD, 2009 WL 230696 (Tenn. Crim. App. Feb. 2, 2009) perm. app. denied (Tenn. Aug. 17, 2009).[1]

The Petitioner filed a timely petition for post-conviction relief claiming ineffective assistance of counsel. After a hearing, the post-conviction court denied the Petitioner's request for relief. On appeal, the Petitioner challenges the denial of post-conviction relief, alleging that he received ineffective assistance of counsel based upon trial counsel's failure to: (1) object on due process grounds when the State announced that it had entered a plea agreement with the Petitioner's co-defendant and the co-defendant would testify against the Petitioner; (2) object to the violation of the sequestration rule when the Petitioner's co-defendant testified after having watched the majority of the State's proof as a co-defendant; (3) call Lisa Regan as a witness to establish her as a potential suspect for the murder; (4) ensure the trial record included arguments concerning the admissibility of a video made by the Petitioner's investigator; (5) object to various incidents of prosecutorial misconduct; (6) interview Ellison Watson or call him as a witness in order to establish an alibi defense; (7) perform a handwriting analysis of the signature on a scale ticket[2] entered into evidence; (8) object to the State's presentation of trial testimony during its closing arguments; (9) object to portions of Tonya Mansel's testimony as uncorroborated hearsay; (10) follow through with an objection he made about the State's leading Ms. Mansel in her testimony or raise the issue on appeal; (11) impeach the State's witnesses or have their testimonies declared inadmissible because the State admitted that their witnesses were withholding evidence and not telling "the whole story;" and (12) object to the variance between the bill of particulars and the proof the State presented at trial. After a thorough review of the record and the applicable

---

[1] On direct appeal, the Petitioner's name was spelled "David Dwayne Smith." For the sake of accuracy, all citations to the direct appeal use this spelling. However, since the Petitioner's indictment is not included in the post-conviction record and the post-conviction petition spells the Petitioner's name as "David Dewayne Smith," we will use that spelling when referring to the Petitioner by name.

[2] In the post-conviction record, the parties refer to this document interchangeably as a "receipt" and an "invoice ticket." The actual document is not included in the post-conviction record. However, on direct appeal, this Court referred to the document as a "scale ticket" from a scrap metal facility. In this opinion, we will refer to the document as a "scale ticket."

law, we affirm the judgment of the post-conviction court.

**Factual and Procedural Background**

*Trial*

A detailed summary of the evidence presented at trial can be found in this Court's opinion from the Petitioner's direct appeal. David Dwayne Smith, 2009 WL 230696, at *1-*11. We will restate the facts as necessary to this appeal. The Petitioner was indicted, along with three other individuals, for first degree premeditated murder and conspiracy to commit first degree murder. Id. at *1.[3] Prior to trial, the State entered a nolle prosqeui as to the charges against co-defendant Ellison Watson. Id. Also prior to trial, the State entered into a negotiated plea agreement with co-defendant Anthony Underwood. Id. Pursuant to this plea agreement, Mr. Underwood entered a plea to a lesser-included offense and agreed to testify against the remaining two co-defendants, the Petitioner and Mitchell Hunter Oakes. Id.

At trial, Mr. Underwood testified that on the night of the murder he, Mr. Oakes, and the Petitioner drove a Cadillac to the victim's home with the goal of scaring the victim. Id. at *4. Before leaving for the victim's house, the Petitioner "pulled a 'do-rag' over his head and put on a pair of surgical gloves, a long-sleeved shirt, and work gloves over the surgical gloves. [The Petitioner] then duct taped the working gloves into the sleeves of his shirt." Id. Mr. Oakes was carrying a pistol. Id. The group drove past the victim's house twice. Id. At the foot of a hill near the victim's house, the Petitioner asked to be let out of the car. Id. The Petitioner exited the car with a .44 pistol and walked into the woods.[4] Id. Mr. Underwood said he and Mr. Oakes drove around for about 20 minutes before the Petitioner returned to the area where he had exited the car. Id. When the Petitioner got back into the car, he said, "It's done, it's taken care of." Id. The group then returned to Mr. Oakes's residence, where the Petitioner showed them that there was one spent round in the gun's chamber. Id. The next morning, they disposed of the weapon. Id.

Two days into the trial, the State entered into a negotiated plea agreement with Mr. Oakes wherein he would plead guilty to the lesser-included offense of solicitation of second degree murder in exchange for his testimony against the Petitioner. Id. at *1. The trial court granted the State's motion to sever Mr. Oakes from the Petitioner, and Mr. Oakes was sequestered. Mr. Oakes then testified as the State's final witness in its case-in-chief. Following Mr. Oakes's direct examination, in which Mr. Oakes identified the Petitioner as

_____

[3] The Petitioner has only included portions of the trial transcript in the record for the post-conviction proceedings. Therefore, we rely on this Court's opinion from the direct appeal for some of the facts of this case. Any time facts are drawn from the our prior opinion, we have provided a citation.

[4] It is unclear from the opinion on direct appeal whether the .44 pistol Mr. Underwood observed the Petitioner carrying was the same pistol Mr. Oakes had been carrying.

the triggerman, the trial court recessed until the next morning to allow trial counsel time to prepare his cross-examination. Trial counsel had about 18 hours to prepare for his cross-examination.

At the conclusion of trial, the jury convicted the Petitioner of first degree premeditated murder and conspiracy to commit first degree murder. The Petitioner received concurrent sentences of life imprisonment for first degree premeditated murder and 20 years for conspiracy to commit first degree murder. This Court affirmed the convictions on direct appeal. Id. at *1.

*Post Conviction Proceedings*

The Petitioner filed a pro se petition for post-conviction relief. Post-conviction counsel was appointed, and an amended petition was filed. In the amended petition, the Petitioner argued that he was denied effective assistance of counsel and listed the 12 grounds enumerated above to support his claim.

At the post-conviction relief hearing, trial counsel testified that he represented the Petitioner during the trial and on direct appeal. Trial counsel stated that before trial, he had reviewed a prior statement Mr. Oakes had made to investigators and gone over it with the Petitioner. He further testified that on the third day of the trial the State announced that it had entered into a plea agreement with Mr. Oakes and that Mr. Oakes would testify against the Petitioner and identify the Petitioner as the person who killed the victim. The State also provided trial counsel with a written statement of Mr. Oakes's proposed testimony. At that point, trial counsel asked the court to grant a mistrial, but the court denied his request. Trial counsel then asked for a continuance. The court denied his motion but agreed to recess after Mr. Oakes's direct examination until 9:00 a.m. the following day so that trial counsel could review Mr. Oakes's written statement and prepare his cross-examination.

Trial counsel did not object to Mr. Oakes's testifying on behalf of the State, and he did not ask the trial court for another continuance when he returned to court the next morning. Trial counsel testified that he did not file a written motion for mistrial after the court denied his oral request because he felt that his time was better spent preparing for the cross-examination of Mr. Oakes.

Trial counsel testified that he was able to identify a number of inconsistencies between the prior statement Mr. Oakes gave to police and the statement he had given the State, as well as some inconsistencies between Mr. Oakes's statements and Mr. Underwood's testimony. Trial counsel stated that he could have benefitted from extra time to conduct further investigations into these inconsistencies. However, trial counsel was able to conduct a

rigorous cross-examination of Mr. Oakes based on the inconsistencies he identified.

Trial counsel further stated that he did not argue that allowing Mr. Oakes to testify would violate the sequestration rule because the rule did not apply to Mr. Oakes while he was a co-defendant.

Additionally, trial counsel testified that he had been aware Lisa Reagan was the victim's girlfriend, and there were allegations that she had been abused by the victim. He stated that he considered calling Ms. Reagan as a witness to establish her as a possible suspect for the murder. However, when trial counsel discussed this defense strategy with the Petitioner, the Petitioner instructed trial counsel to "go along with" Mr. Oakes's defense strategy.[5] Ultimately, trial counsel elected not to call Ms. Reagan as a witness. Ms. Reagan had provided a number of statements to law enforcement, the Petitioner's investigator, and trial counsel, and those statements were largely inconsistent. Trial counsel testified that he was uncertain what Ms. Reagan would say on the stand, and once Mr. Oakes testified against the Petitioner, trial counsel did not want to risk placing her on the stand and having a third person accuse the Petitioner of committing the murder. Additionally, trial counsel stated that he would not have asked the court for a continuance to interview Ms. Reagan because, no matter how many statements she gave, he "never would have been comfortable with what she would say if you put her on the witness stand." He further stated that he did not enter Ms. Reagan's written statements into evidence because they were hearsay.

Trial counsel testified that he hired Rick Berry, a private investigator, to help him investigate the case. As part of that investigation, Mr. Berry reviewed Mr. Underwood's statement. Mr. Underwood claimed that, on the night of the murder, the Petitioner was dropped off on a road some distance from the victim's home after dark and that the Petitioner walked up a hill through the woods to reach the victim's house. Mr. Berry and trial counsel discovered that based on the weather report and moon phases on the night of the murder, there was little to no moonlight. Further, there were no lights near the route that the Petitioner was alleged to have walked to get to the victim's house. Mr. Berry and trial counsel went to the location where Mr. Underwood stated the Petitioner was dropped off around the same time of night the murder occurred in order to see if they could get to the top of the hill and back in the time frame established by Mr. Underwood's statement. They also documented this excursion on video. The video was offered at trial for identification purposes but was not admitted into evidence. Trial counsel testified that the trial court ruled that it was not admissible because there was no way to determine that the conditions in the video were the same as the conditions on the night of the murder.

Trial counsel testified that he never interviewed Ellison Watson, one of the three

---

[5] The record does not explain what Mr. Oakes's trial strategy was.

individuals originally indicted with the Petitioner, because the Petitioner had indicated that Mr. Watson's testimony would be adverse to the Petitioner's defense. Trial counsel again testified that the Petitioner instructed him to "go along" with Mr. Oakes's defense strategy. Additionally, trial counsel did not interview Mr. Watson after Mr. Oakes testified because the Petitioner had convinced him that Mr. Watson's testimony would not be helpful. Further, trial counsel was concerned that Mr. Watson's testimony would undermine favorable testimony from other witnesses.

Trial counsel noted that the car the defendants drove on the night of the murder was sold as scrap, and the scale ticket was allegedly signed by the Petitioner. However, the Petitioner told trial counsel that he never signed the scale ticket. Trial counsel admitted that he did not have the signature on the scale ticket analyzed by a handwriting expert. Instead, he obtained a copy of the Petitioner's driver's license, as well as several other documents containing the Petitioner's signature. Trial counsel testified that he compared the signature on the scale ticket with the Petitioner's known signatures, and the signatures "didn't look anything alike."[6] Trial counsel believed that the jury could compare the signature on the scale ticket to other examples of the Petitioner's signature and see that they were different without the aid of expert testimony.

Although trial counsel had wanted to show the jury the differences between the signatures, the Petitioner instructed him not to introduce the evidence at trial. Instead, the Petitioner told trial counsel to go along with Mr. Oakes's defense strategy.

Trial counsel recalled that Lisa Mansel testified at trial that she had seen the Petitioner at a social gathering sometime after the murder. Ms. Mansel testified that the attendants of the social gathering had been discussing the murder, and when the attendants turned to look at the Petitioner, he grinned. According to trial counsel, when Ms. Mansel asked the Petitioner if he had killed the victim, the Petitioner responded, "I didn't feel a damn thing." Trial counsel stated that he discussed this statement with the Petitioner, and the Petitioner explained that he was referring to himself when he made that statement.

The Petitioner did not include a complete copy of Ms. Mansel's trial testimony in the post-conviction record. However, on direct appeal this Court outlined the relevant portion of her testimony as follows:

During this [social gathering], Ms. Mansel asked the group in general if they

---

[6] Trial counsel explained that the handwriting on the scale ticket was much neater than the Petitioner's normal handwriting. Additionally, the scale ticket was signed "David Smith," but the Petitioner customarily signed documents as "D[e]wayne Smith."

had "heard about the murder across the mountain," and Ms. Mansel commented that she "heard it was execution style." According to Ms. Mansell, [the Petitioner] responded, "He didn't feel a damn thing." Ms. Mansel asked [the Petitioner], "Damn, did you do it." Ms. Mansel stated that Lynn Watson said at that point, "Drop it." Defense counsel objected to the statement as hearsay, and his objection was sustained by the court. Ms. Mansel then testified as follows:

> MS. MANSEL: He–he didn't respond, [the Petitioner] didn't respond. He kind of grinned and–
> THE STATE: What was the look on his face?
> MS. MANSEL: Kind of a grin, you know. Very–pretty much cold.
> THE STATE: Pretty cold? You felt it was pretty cold the way that . . .
> MS. MANSEL: Yeah.

David Dwayne Smith, 2009 WL 230696, at *30.

During closing arguments, the State referred to Ms. Mansel's testimony, claiming the Petitioner answered Ms. Mansel's question by saying, "He didn't feel a damn thing." In the post-conviction proceedings, trial counsel asserted that the State's argument was not an accurate quote from Ms. Mansel's testimony. However, trial counsel conceded that he did not object to the statement. Trial counsel explained that Ms. Mansel had given a written statement to investigators wherein she wrote, "He said he didn't feel a damn thing." Trial counsel explained that he thought her statement was ambiguous, and he did not object to the State's closing argument because he felt the State had a basis for making it based on Ms. Mansel's testimony. Trial counsel further stated that he raised the issue on direct appeal.

Trial counsel recalled that the trial court allowed Ms. Mansel's testimony about the Petitioner's grinning as a non-verbal admission of a party opponent. Trial counsel admitted that he did not object to this testimony during the trial, but he noted that he had challenged it in a pre-trial motion and felt that the issue was preserved for appeal. Trial counsel could not remember whether he challenged the admission of testimony about the Petitioner's grin on appeal. However, trial counsel explained that if he failed to raise that issue on appeal, it was because he thought other issues were more persuasive.

Trial counsel also noted that the State admitted in its closing argument that its own witnesses were withholding evidence and "not telling the whole story." Trial counsel did not object to this statement. He explained that he had spent most of the night before preparing for the cross-examination of Mr. Oakes. He said that he was troubled by the State's

argument, but he did not know what basis he would have to object. Additionally, trial counsel argued in his closing statement that, since the State agreed that its witnesses were not credible, the jury should not use their evidence to convict the Petitioner.

Trial counsel also testified that he requested and was provided a bill of particulars in preparation for trial and he relied on the State's response to develop a trial strategy. Additionally, trial counsel filed a motion before trial to require the State to give a more detailed bill of particulars. Trial counsel was able to get a little more information about the time frame of the crime, but ultimately the trial court ruled that the State had complied with its obligations. However, as the proof developed at trial, some of the evidence was inconsistent with what was disclosed in the bill of particulars.

On cross-examination, trial counsel testified that he had been practicing criminal law since 1999, and at the time of the trial, criminal law constituted about 40 percent of his practice. Before this case, trial counsel had never tried a first degree murder case, but he stated that he felt competent to represent the Petitioner. Trial counsel stated that he did not have any problems working with the Petitioner and that the Petitioner was able to communicate with trial counsel about the case. Because the Petitioner was out on bond awaiting trial, he could visit trial counsel whenever he liked, and they met "a number of times" in preparation for trial. Additionally, trial counsel researched investigators to assist in preparing the case and chose an investigator that Mr. Oakes's attorney often used in order to "beat [him] to the punch."

Trial counsel began preparation for trial by gathering as much information he could about the chronology of the crime and the identity of any witnesses. Through his investigation, trial counsel discovered facts that could have benefitted the Petitioner and hurt Mr. Oakes. Moreover, the State did not have direct evidence to prove who actually shot the victim, and trial counsel perceived that Mr. Oakes planned to blame the shooting on one of the other co-defendants or Ms. Reagan. Trial counsel was concerned Mr. Oakes would identify the Petitioner as the triggerman, and he shared all of this information with the Petitioner.

Trial counsel stated that he would have preferred to have the Petitioner's case severed from the other co-defendants, but the trial court declined to sever the cases before trial. Had the Petitioner been severed from his co-defendants, trial counsel believed the Petitioner may have been less inclined to align his defense with that of Mr. Oakes. However, because the cases were not severed, the Petitioner elected not to contradict Mr. Oakes's defense and decided they would "sink or swim together."

Trial counsel noted that, on direct appeal, he raised the issue of prosecutorial

misconduct during closing arguments. He noted that the State argued in its closing statement that the Petitioner's defense was "smoking mirrors."[7] Trial counsel did not object to the comment because he felt that it could ultimately benefit the Petitioner's case. Trial counsel admitted that he did not object to the "smoking mirrors" comment for tactical reasons, but he claimed that he failed to object to other instances of prosecutorial misconduct because they "went by [him]."[8]

Ellison Watson testified that he is the Petitioner's uncle and one of the four individuals originally charged in the indictment. The State dismissed the charges against Mr. Watson before trial. Mr. Watson stated that he was never contacted by anyone defending the Petitioner at trial. He stated that he was not with the Petitioner on the night of the murder, and he knew nothing about the case that would benefit the Petitioner.

In denying relief on the petition, the post-conviction court found that trial counsel asked for a mistrial and a continuance when the State announced that Mr. Oakes would testify against the Petitioner. The trial court denied the motion for mistrial and gave trial counsel until the next morning to prepare his cross-examination of Mr. Oakes. The post-conviction court found that a separate objection on the basis of a violation of due process would not have made any difference in the case.

The post-conviction court found that Mr. Oakes was not subject to the rule of sequestration when he was a co-defendant, and he was sequestered as soon as his case was severed from the Petitioner's case. Additionally, the court found that the outcome of the trial was not affected by Mr. Oakes's presence in the courtroom for the majority of the State's proof.

As to the failure to call Ms. Reagan as a witness, the post-conviction court noted that Ms. Reagan did not testify at the post-conviction hearing, so the court had no evidence as to whether her testimony would have been helpful to the Petitioner. Further, the post-conviction court found that trial counsel made a strategic decision not to call her as a witness.

Regarding the allegation that trial counsel failed to include in the trial record arguments concerning the admissibility of the investigator's video, the post-conviction court found that the trial court ruled the video was inadmissible. Further, the post-conviction court

---

[7] This Court believes the State meant to say "smoke and mirrors."

[8] Trial counsel raised these issues on appeal, but this Court found that any issue of prosecutorial misconduct was waived because trial counsel did not contemporaneously object to the challenged statements. See David Dwayne Smith, 2009 WL 230696, at *18.

stated that the video is not part of the record and there was no showing as to how it could have changed the outcome of the trial. Based on the evidence provided, the post-conviction court found that trial counsel was not deficient in this regard.

As to trial counsel's failure to object to instances of alleged prosecutorial misconduct, the post-conviction court found that trial counsel was not deficient and an objection would not have changed the outcome of the trial. The post-conviction court found that trial counsel made a strategic decision not to object during the State's closing argument. The court did not find any proof to support the Petitioner's allegations of blatant misconduct, and it noted that saying "[h]e's blowing – smoking mirrors" is not unusual within arguments.

As to the failure to subpoena Mr. Watson to testify, the post-conviction court found that, because Mr. Watson's testimony would not have been helpful to the Petitioner, the Petitioner failed to establish deficient performance or prejudice.

As to the failure to perform a handwriting analysis on the signature on the receipt, the post-conviction court found that the Petitioner instructed trial counsel not to introduce evidence that the signature was forged. Further, the post-conviction court noted that the Petitioner did not offer any evidence at the hearing to prove that the signature was forged. The post-conviction court found that trial counsel was not deficient, and the Petitioner suffered no prejudice.

Regarding trial counsel's failure to object to the State's characterization of Ms. Mansel's testimony during closing arguments, the post-conviction court noted that trial counsel did not object when the State presented Ms. Mansel's testimony as Petitioner's stating, "He didn't feel a damn thing," even though Ms. Mansel supposedly testified that the Petitioner said, "I didn't feel a damn thing." The post-conviction court found that trial counsel made a reasonable decision not to object in that situation, and the Petitioner offered no proof that an objection would have changed the outcome of the trial.

As to counsel's failure to object to Ms. Mansel's testimony that the Petitioner grinned in response to her question on the basis of hearsay, the post-conviction court found that her testimony was admissible. Further, the post-conviction stated that the Petitioner offered no proof that the trial court would have sustained an objection.

As to the allegation that trial counsel failed to object to leading questions in Ms. Mansel's testimony, the post-conviction court stated that no proof had been offered pertaining to leading questions. Therefore, the Petitioner failed to show that an objection would have had any bearing on the outcome of the trial.

-10-

Regarding trial counsel's failure to impeach the State's witnesses or have their testimony excluded because they were not "telling the whole story," the post-conviction court expressed doubt that any objection would have been sustained. Further, the court found that the State's witnesses were subject to "vigorous cross-examination," and the Petitioner had not offered any proof to show that he was prejudiced.

As to any variance between the bill of particulars and proof presented at trial, the post-conviction court noted that this Court addressed the issue on direct appeal and found that there was no significant variance.

Overall, the post-conviction court found that trial counsel "acted within the professional bounds of reason," and the Petitioner was not prejudiced by trial counsel's decisions. Therefore, the post-conviction court denied the petition for post-conviction relief. This timely appeal followed.

## **Analysis**

In order to prevail upon a petition for post-conviction relief, a petitioner must prove all factual allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f) (2012); Jaco v. State, 120 S.W.3d 828, 830 (Tenn. 2003). "Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." Grindstaff v. State, 297 S.W.3d 208, 216 (Tenn. 2009) (quoting Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998)). Whether the petitioner has met his burden of proof is a question of law that this Court reviews de novo. Arroyo v. State, 434 S.W.3d 555, 559 (Tenn. 2014).

Post-conviction relief cases often present mixed questions of law and fact. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001) (citing State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999)). We review a trial court's findings of fact under a de novo standard with a presumption that those findings are correct unless otherwise proven by a preponderance of the evidence. Id. (citing Tenn. R. App. P. 13(d); Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997)). The trial court's conclusions of law are reviewed "under a purely *de novo* standard, with no presumptions of correctness . . . ." Id. When reviewing the trial court's findings of fact, this Court does not reweigh the evidence or "substitute [its] own inferences for those drawn by the trial court." Id. at 456. Additionally, "questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the trial judge." Id. (citing Henley, 960 S.W.2d at 579).

The right to effective assistance of counsel is safeguarded by the Constitutions of both

the United States and the State of Tennessee. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. In order to receive post-conviction relief for ineffective assistance of counsel, a petitioner must prove two factors: (1) that counsel's performance was deficient; and (2) that the deficiency prejudiced the defense. Strickland v. Washington, 466 U.S. 668, 687 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (stating that the same standard for ineffective assistance of counsel applies in both federal and Tennessee cases). Both factors must be proven in order for the court to grant post-conviction relief. Id.; Henley, 960 S.W.2d at 580; Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996).

As to the first prong of the Strickland analysis, "counsel's performance is effective if the advice given or the services rendered are within the range of competence demanded of attorneys in criminal cases." Henley, 960 S.W.2d at 579 (citing Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)); see also Goad, 938 S.W.2d at 369. In order to prove that counsel was deficient, the petitioner must demonstrate "that the counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad, 938 S.W.2d at 369 (citing Strickland, 466 U.S. at 688); see also Baxter, 523 S.W.2d at 936. Additionally, review of counsel's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689; see also Henley, 960 S.W.2d at 579. We will not second-guess a reasonable trial strategy, and we will not grant relief based on a sound, yet ultimately unsuccessful, tactical decision. Granderson v. State, 197 S.W.3d 782, 790 (Tenn. Crim. App. 2006).

Even if counsel's performance is deficient, the deficiency must have resulted in prejudice to the defense. Goad, 938 S.W.2d at 370. Therefore, under the second prong of the Strickland analysis, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. (quoting Strickland, 466 U.S. at 694)(internal quotation marks omitted).

In cases where a petitioner contends that trial counsel failed to discover, interview, or present a witness in support of the petitioner's defense, the petitioner must present such witness at the post-conviction hearing. Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). Neither a trial nor an appellate judge can speculate as to whether a certain witness could have been found or whether that witness's testimony would have been favorable to the defense. Id. Therefore, the petitioner must "produce a material witness who (a) could have been found by a reasonable investigation and (b) would have testified favorably in support of his defense if called [at trial]. Otherwise, the petitioner fails to establish the prejudice requirement mandated by *Strickland v. Washington*." Id. at 758.

*Failure to Object to Mr. Oakes's Testimony on Due Process Grounds*

The Petitioner argues that trial counsel was ineffective because he failed to object on due process grounds when the State announced on the third day of trial that Mr. Oakes had entered into a plea agreement and would testify against the Petitioner. The Petitioner admits that trial counsel orally requested a mistrial and a continuance, but his motions were denied. The Petitioner contends that trial counsel should have filed a formal motion for mistrial "because of the surprise testimony and violation of due process and notice." In its brief, the State notes that the post-conviction court found that a separate objection from trial counsel would not have affected the outcome of the trial. The State argues that the evidence does not preponderate against the post-conviction court's finding. We agree with the State.

Trial counsel's testimony from the post-conviction hearing shows that he requested both a mistrial and a continuance when the State announced that Mr. Oakes would testify against the Petitioner, and the trial court denied both motions. However, after Mr. Oakes's direct examination the trial court recessed until the next morning to allow trial counsel to prepare for his cross-examination. Trial counsel was able to find a number of inconsistencies between Mr. Oakes's statement and Mr. Underwood's testimony, and trial counsel was able to vigorously cross-examine Mr. Oakes based on these inconsistencies. Further, the Petitioner has provided no evidence to show that the outcome of the trial would have been different if trial counsel had raised another objection. The Petitioner is not entitled to relief.

*Failure to Object to the Violation of Sequestration Rule*

The Petitioner argues that trial counsel should have objected to Mr. Oakes's testimony as a violation of the sequestration rule because Mr. Oakes was able to sit through the trial and hear the testimony of the majority of the State's witnesses. The State argues that the sequestration rule did not apply to Mr. Oakes until he became a witness, and once Mr. Oakes was severed from the Petitioner, he was sequestered for the remainder of the State's case-in-chief. We agree with the State.

Upon request of a party, Tennessee Rule of Evidence 615 excludes all witnesses from watching or disclosing any evidence presented at trial. However, by its own terms the rule does not apply to "a party who is a natural person." Tenn. R. Evid. 615. Mr. Oakes was a co-defendant during the first two days of the trial; he could not have been excluded under the sequestration rule. Once the State announced that it had reached a negotiated plea agreement with Mr. Oakes and he would be testifying against the Petitioner, Mr. Oakes was sequestered for the testimony of State's remaining witness. Therefore, trial counsel had no basis to object to Mr. Oakes's testimony as a violation of the sequestration rule. The Petitioner is not entitled to relief.

*Failure to Call Lisa Reagan as a Witness*

The Petitioner argues that trial counsel was deficient for failing to call Ms. Reagan to the stand because she had a motive to kill the victim. The State argues that trial counsel made a strategic decision not to call Ms. Reagan, and he was not deficient in doing so. Further, the State argues that the Petitioner has failed to prove he was prejudiced because Ms. Reagan did not testify at the post-conviction hearing. We again agree with the State.

Trial counsel testified that he was not comfortable calling Ms. Reagan to the stand because he was not sure what she would say. After Mr. Oakes testified against the Petitioner, trial counsel did not want to risk Ms. Reagan also identifying the Petitioner as the killer. Because we will not second-guess a reasonable trial strategy, see Granderson, 197 S.W.3d at 790, we cannot say that trial counsel's decision constitutes deficient performance. Further, because Ms. Reagan did not testify at the post-conviction hearing, the Petitioner has failed to show that he was prejudiced by trial counsel's decision not to call her as a witness. See Black, 794 S.W.2d at 757-58. The Petitioner is not entitled to relief.

*Failure to Include the Arguments Concerning the Admissibility of the Investigator's Video Tape in the Record on Direct Appeal*

The Petitioner argues that trial counsel was deficient because he failed to include in the direct appeal record a transcript of the arguments concerning the admissibility of the video tape made by the Petitioner's investigator. The Petitioner contends that trial counsel's failure to make the record complete precluded this Court from reviewing the issue on direct appeal. The Petitioner argues that the video tape would have shown that it was too dark for the Petitioner to have made it from the point he exited the car to the victim's home and back in the allotted time-frame, and its introduction would have changed the outcome of the trial. The State argues that because the videotape was not included in the post-conviction record, the Petitioner has failed to prove that the tape would alter the outcome of the trial. We agree with the State.

On direct appeal, this Court noted that the trial transcript did not reflect whether the trial court made a ruling as to the admissibility of the video. David Dwayne Smith, 2009 WL 230696, at *29. However, in the post-conviction proceedings trial counsel testified and the post-conviction court found that the trial court ruled that the tape was inadmissible. Further, the Petitioner has not included the omitted portion of the trial transcript or the actual video tape in the post-conviction record, and he has not provided any evidence that introduction of the videotape would have changed the outcome of the trial. Therefore, the Petitioner has failed to prove that he was prejudiced by trial counsel's failure to ensure the record on appeal was complete regarding the videotapes. See Black, 794 S.W.2d at 757-58. The Petitioner is not entitled to relief.

*Failure to Object to Various Incidents of Prosecutorial Misconduct*

The Petitioner argues that trial counsel was deficient for failing to object to "various issues showing prosecutorial misconduct." Due to trial counsel's failure to object, this Court did not consider the issue on direct appeal. David Dwayne Smith, 2009 WL 230696, at *18. The Petitioner contends that "proof that the prosecutor was blatantly engaged in misconduct against the [P]etitioner could have changed the entire outcome of the appeal." The State argues that the Petitioner has failed to offer proof of any alleged misconduct and has therefore waived the issue.

The post-conviction court found no instances of blatant prosecutorial misconduct. It also determined that reasonable minds could disagree as to whether the statement, "He's blowing–smoking mirrors," constituted prosecutorial misconduct. Nevertheless, the post-conviction court found that trial counsel made a tactical decision not to object to the "smoking mirrors" comment. We will not second-guess trial counsel's reasonable strategic decision on appeal. See Granderson, 197 S.W.3d at 790.

Therefore, we hold that trial counsel was not deficient in failing to object to the State's comment that the defense was "smoking mirrors." Further, the Petitioner has not proven that such objection would have changed the outcome of the trial. As to any other incidents of prosecutorial misconduct, the Petitioner has failed to offer any proof or cite to the trial record. As such, the Petitioner is not entitled to relief.

*Failure to Interview or Subpoena Ellison Watson*

The Petitioner argues that trial counsel was deficient for failing to interview or subpoena Ellison Watson. The Petitioner contends that trial counsel should have developed Mr. Watson as a possible alibi witness once another witness testified that he had seen the Petitioner with Mr. Watson during the time-frame of the murder. The State argues that the Petitioner is not entitled to relief because Mr. Watson testified at the post-conviction hearing that he was not with the Petitioner on the night of the murder and he did not know anything that would help the Petitioner's defense. We agree with the State.

Trial counsel testified that the Petitioner told him numerous times that Mr. Watson would not be helpful to his defense. Additionally, the Petitioner instructed trial counsel to pattern his defense off Mr. Oakes's defense strategy. Based upon the Petitioner's representations, trial counsel did not interview or subpoena Mr. Watson. . In light of Mr. Watson's testimony, the Petitioner has failed to show that he suffered any prejudice from trial counsel's failure to interview or subpoena Mr. Watson. The Petitioner is not entitled to relief.

-15-

*Failure to Perform a Handwriting Analysis*

The Petitioner argues that trial counsel was deficient for failing to perform a handwriting analysis on the signature, purported to be the Petitioner's, on the scale ticket from the scrap metal facility. The Petitioner contends that, had trial counsel "done the handwriting analysis as the [P]etitioner requested," the evidence would show that the Petitioner's signature was forged and would create reasonable doubt that the Petitioner was involved in the crime. The State argues that the Petitioner instructed trial counsel not to use any evidence to show that the signature was forged and therefore the issue is waived. Additionally, the State argues that the Petitioner did not present any proof at the post-conviction hearing to show that it was not his signature on the scale ticket, and thus, he has failed to prove he was prejudiced.

Trial counsel testified that he compared the signature on the scale ticket from the scrap metal facility to signatures on several documents that the Petitioner admitted to signing, and the signatures did not look anything alike. While trial counsel admitted that he did not have a handwriting expert analyze the signature on the scale ticket, trial counsel stated that he thought the jury could see the differences between the signature on the ticket and examples of the Petitioner's signature without the aid of expert testimony. Trial counsel testified that he wanted to present this evidence to the jury, but the Petitioner instructed him not to do so.

Even if we were to find that trial counsel was deficient in failing to obtain a handwriting analysis or present evidence about the inconsistent signatures to the jury, the Petitioner has failed to establish that he suffered any prejudice. The only evidence presented at the post-conviction hearing was trial counsel's statements that the signature on the scale ticket did not resemble other examples of the Petitioner's signature. The Petitioner did not present any evidence as to what the results of a handwriting analysis would show or if it would have benefitted him. Moreover, the Petitioner did not provide the scale ticket and examples of his known signature at the post-conviction hearing. Because the Petitioner did not present such evidence, he has failed to prove that he was prejudiced by trial counsel's failure to have a handwriting analysis performed or by trial counsel's failure to present other evidence that the signatures were inconsistent. See Black, 794 S.W.2d at 757-58. The Petitioner is not entitled to relief.

*Failure to Object to the State's Presentation of Lisa Mansel's*
*Testimony During Closing Arguments*

The Petitioner argues that trial counsel should have objected when the State argued in closing that Ms. Mansel heard the Petitioner say, "He did not feel a damn thing." The Petitioner contends that Ms. Mansel actually testified that the Petitioner said, "I didn't feel

a damn thing," and trial counsel's failure to object allowed the State to give the jury an inaccurate impression that the Petitioner was referring to the victim when he made that statement. The State argues that the evidence does not preponderate against the post-conviction court's finding that the statement was open to different interpretations, and an objection would not have changed the outcome of the trial.

Trial counsel testified that he did not object to the State's closing argument because he thought Ms. Mansel's statement was ambiguous, and the State had a reasonable basis to characterize her statement as it did. Based on the record, we cannot say that trial counsel was deficient for failing to object to the characterization of Ms. Mansel's testimony. Moreover, even if trial counsel was deficient, the Petitioner has failed to provide any evidence as to how the State's argument prejudiced his defense. The Petitioner is not entitled to relief.

*Failure to Object to the Admission of Hearsay Evidence*

The Petitioner argues that trial counsel was deficient in failing to object to Ms. Mansel's statement that the Petitioner grinned when she asked if he had killed the victim. The Petitioner avers that Ms. Mansel's testimony was inadmissible hearsay and that the State used her testimony to obtain a false conviction. The State argues that trial counsel did object to Ms. Mansel's testimony, and the trial court allowed the statement as a non-verbal admission by a party opponent. Further, the State notes that the Petitioner failed to present evidence to show that the trial court's ruling was incorrect.

We note that on direct appeal, this Court reviewed the issue of whether Ms. Mansel's testimony about the Petitioner's grin should have been excluded. We concluded that the trial court did not err when it admitted the testimony as a non-verbal admission by a party opponent. David Dwayne Smith, 2009 WL 230696, at *30-31. It is clear from our opinion on direct appeal that trial counsel made sufficient objection to Ms. Mansel's statement so as to preserve the issue for appeal. Therefore, we find that counsel was not deficient. Therefore, the Petitioner is not entitled to relief.

*Failure to Follow Through with Objections Made to Leading Questions*

The Petitioner argues that trial counsel failed to "follow through with the objection he made about the prosecutor leading Ms. Mansel's testimony." However, the Petitioner did not provide any evidence as to this issue at the post-conviction hearing. Therefore, we find that the Petitioner failed to establish by clear and convincing evidence that trial counsel was ineffective and is not entitled to relief.

*Failure to Impeach State's Witnesses or Have Their Testimonies Declared Inadmissible*

The Petitioner argues that trial counsel should have impeached the "State's witnesses"[9] or sought to have their testimonies declared inadmissible because the State admitted in its closing that its witnesses were "withholding evidence and not telling the whole story." The Petitioner contends that, had trial counsel challenged the witnesses' testimony, the outcome of the trial would have changed. The State argues that the record supports the post-conviction court's finding that trial counsel subjected the State's witnesses to "vigorous cross-examination" and that the Petitioner failed to demonstrate any prejudice. We agree with the State.

Trial counsel cross-examined both Mr. Underwood and Mr. Oakes, and he was able to expose a number of inconsistencies in their respective testimonies. Further, trial counsel testified that he argued in his closing that because the State agreed that its witnesses were not credible, the jury should not use their testimony to convict the Petitioner. The Petitioner is not entitled to relief.

*Failure to Object to Variance Between the Bill of Particulars and Evidence*
*Presented at Trial*

The Petitioner argues that trial counsel was deficient in failing to object to a variance between the bill of particulars and the evidence present at trial. On appeal, the Petitioner does not explain how the evidence at trial differed from the facts listed in the bill of particulars, and the State correctly notes that this Court found on direct appeal that there was no significant variance between the bill of particulars and the evidence presented at trial. See David Dwayne Smith, 2009 WL 230696, at *35. Because there was no significant variance, the Petitioner cannot demonstrate deficient performance or prejudice. Therefore, the Petitioner is not entitled to relief.

## Conclusion

For the aforementioned reasons, we affirm the judgment of the post-conviction court.

_____
ROBERT L. HOLLOWAY, JR., JUDGE

---

[9] The Petitioner does not identify which of the "State's witnesses" he contends trial counsel should have impeached. However, upon reviewing the transcript of a portion of the State's closing argument that is attached as an exhibit to the transcript of the post-conviction hearing, it appears that the Petitioner is referring to Mr. Underwood and Mr. Oakes as the "State's witnesses."